VENTIS PHARMA v. HOSPIRA May it please the court, there are three fundamental errors that we ask this court to address and correct in this appeal. First, the district court's error in construing the term profusion in Claim 5 of the 561 to include unstable or toxic solutions and then mistakenly basing an obvious misfinding on that fundamental error. Second, the district court's error in construing Claim 7 of the 512 patent to turn on how a profusion is made when in fact it was a composition claim and then basing improper findings of non-infringement on that fundamental error. And finally, the district court's error in declaring the patents unenforceable based on a finding of inequitable conduct that particularly in light of this court's in-bank decision in Therosense is neither supported by the facts or the law. Now given the importance of these issues and the time limitations, I would like to focus on the first of these points and advise the court that if necessary, and I'm unable to reach the second and third points, that we rest on our briefing on those two issues. Let me turn first to the district court's claim construction. Specifically, Judge Sleet construed the term profusion to encompass any solution that includes an active ingredient and an aqueous infusion fluid in a bag, even if that solution is unstable or toxic to the patient, even to the point of causing death. That's at 830-31. And even if that profusion would be ineffective for treating the very conditions it was designed to treat. Now our point is fundamental and I think straightforward. That construction is wholly disconnected from the patent's disclosure of this remarkable invention. Your argument in this regard seems to hinge on the fact that he overlooked or omitted what you consider limitations to the claim right, which is safety, efficacy, and stability. That's your view, right? Your Honor. Those limitations should have been placed on his construction of the term profusion. Your Honor, I would say the answer to that question is yes, we believe he overlooked it, but I would not call them limitations. I would call those part and parcel of the definition of the word profusion, Your Honor, as it was used by the patentees in this case. Well, I mean, we've got the claim language to look at, which doesn't use the reference at all to safety, efficacy, and stability. Indeed, they have a specific exception and it deals with specific things like alcohol intoxication. So we're in the spec. I understand you've got the eight hours with respect to the stability question, but my scan of the spec doesn't reveal that they mention the word stability and efficacy, safety and efficacy are not found in this application at all, right? So what can you point to either in the claim language and the specification to support your view of profusion as inherently including the limitations of safety and efficacy? Very well, Your Honor. Let me answer that as follows. First of all, we believe that stability is part and parcel of safety and effectiveness. In other words, to make a profusion, they're not necessarily three separate, so I'd like to focus on stability for this reason. In order to make a profusion for intravenous infusion into the human body, which basically always has an active ingredient in the aqueous solution, it is beyond capital that it must be stable for some period of time, and we say that that stability is part of safety and effectiveness. And let me just say why. So your view is that he should have construed profusion to say it requires some level of stability for some period of time, and that would have satisfied what you're arguing? I think it would have, and that would have been part of being safe and effective. But let's focus on stability. I mean, the only thing that the spec says that I could find with respect to stability is an eight hour. So you're saying it's not necessarily tied to an eight hour limitation. It's any amount of time, right? No, Your Honor, that was my next point. Once we understand that physical stability is an essential part of any profusion, then the question naturally arises, all right, does the specification and the file history tell us what that minimum stability is? And your conjection of minimum stability is eight hours? Yes. Your own label says four hours, right? Your Honor, the label says four, but that's because of FDA requirements. You need a safety margin. Just like Hospira's product is labeled for four, but it's stable for eight. It's well understood in the art, and it was in the record, that you need a safety margin for preparation of the profusion and for the fact that there may be difficulties when you begin infusing the woman, for instance, with breast cancer with Taxotere, that there is time to get her prepared. So there's always a safety margin. In other words, if we were only... Four hours? Four hours, yes. What's the basis for saying there has to be a four hour safety margin? That's FDA. How do I know that that's right? It's in the label, Your Honor. And that's what we... How do I know what? That's what we demonstrate. Why does it have to be eight hours to comply with the four hour requirement? Suppose instead of eight hours, it were seven and a half hours. Would that comply with the FDA? I don't know the answer to that, Your Honor, but I think it would. But what I'd like to... Well, that's a problem for you because, you know, you yourself say that a product that was stable for seven and a half hours would satisfy FDA requirements. And yet, under your view, that product wouldn't infringe under the eight hour stability requirement. The answer is, Your Honor, I don't know whether it would satisfy FDA, but I submit the question for this appeal is what the proper interpretation of the word perfusion is and what the inventors claim. And what the inventors demonstrated, and it's in the patent, is that they discovered the ability to keep polysorbate 80 with docetaxel, which is notoriously one of the most insoluble active ingredients in science, in solution, in a perfusion for a minimum of eight hours. So, not only do we have the spec, but I think it's important to point, Your Honor, that we have also the file history. And I'd like the court's attention to be directed to 5404 through 5405. Is that TAR? That's TAR, Your Honor. TAR was four and a half hours. So where do you get the file history? You say we had to distinguish it from TAR, which is four and a half, so it's something more than four and a half, right? Yes. Where does that get you to eight? Your Honor. If we were going to rely exclusively on the file history and really doctor arguments and say it has to be more than four and a half, right? I'm not saying you have to rely exclusively on the file history. I'm just saying that in terms of the court determining whether or not the district court made an error in claim construction, we look to the specification in the file history. What supports eight hours? Pardon? What supports eight hours other than that one reference in the spec? The specification supports eight hours, Your Honor. Are there any other support for eight hours other than that one reference in the spec? Yes, Your Honor. If you examine examples one, two, and three in the 561 patent, they're all for periods of stability, eight hours, or even in excess of eight hours. So on that point, Your Honor, I think it's very critical for us. If you read this specification, first of all, there is a definition of stability. It couldn't be any clearer. The new perfusions, new as opposed to prior art, are stable from a physical standpoint, that is to say no precipitation phenomenon is seen to appear within approximately eight hours. All the examples are for eight or longer. So any skilled artisan reading this patent would say, of course, what they invented is a perfusion that's stable for at least eight hours, and that is how we distinguished it over the prior art. So if the applicant wanted the eight hours in there, why wasn't it in the claim? There are other limitations that are placed in the claims. Why wouldn't the applicant put something in the claims? I mean, it seems to me that the conclusion you draw from that is they wanted something broader. Your Honor. They didn't want to limit it to eight hours. No, Your Honor. I think it wasn't necessary. I mean, you can always add language to a claim, but it wasn't necessary because perfusion, as used in this patent, is eight hours or more stability. Where I think the district court, if you read his opinion, first of all, I think it's surprising, I'll leave it at that, that in a 72-page opinion, there is no citation to the Phillips decision of his court. In fact, there was no Phillips analysis. What Judge Sleep did was he accepted Dr. Myrdal's deposition that a perfusion is simply an active ingredient in a bag with an aqueous solution. Well, he went a little beyond that. He even relied on, didn't he cite Dr. Burris, your own witness' testimony with respect to what perfusion means? He did cite the expert testimony on perfusion. He cited that. Well, Your Honor, he cited that, but the fact of the matter is that debate that largely took place at the trial level was what a perfusion could be. And what we say the court should focus on in this case is what did the inventors mean when they used the word perfusion? Because ever since this court's decision in Phillips, you have warned us against dictionary definitions or even looking to expert testimony whose testimony may be at odds with what's in the specification. Let me give you an example. And in this case, the specification is clear. We never mention a period of stability less than 8 hours. Your Honor, can I turn you to inequitable conduct before your time runs out? Certainly. I mean, you obviously turned your head on theracents. Am I right that materiality with respect to theracents is off the table, particularly if we were to affirm the conclusions with respect to obviousness and validity? In other words, I mean, theracents but for the perfect example of meeting the test of materiality with theracents is where the court has struck down the patents as obvious or has declared the patents that invalid as obvious, right? I'm not sure I understand your question, Your Honor. If we were to affirm the district court's obviousness conclusion, then that kind of takes any issue with respect to whether or not theracents was correctly applied in terms of the but-for analysis kind of off the table, does it not? Because we're dealing with references that have led to the finding of invalidity of the patents. No, Your Honor, they don't because with respect to either the Gourette-Bogelin, the GV reference, or the Vidal, there were references before the patent office already that disclosed, that made certain disclosures. So there could have been, these references would not have been material in any event. In other words, there were prior references that disclosed the use of polysorbate aid to make a perfusion. Well, let's assume then that we disagree with you. I mean, you argued to the court below that these references were exclusively just redundant of references that were already before the patent examiner. And that argument was rejected in the finding that the patent was obvious, right? Well, it was rejected based on a claim construction that only required it to be an active ingredient in solution in a bag, Your Honor. If we assume that the references meet the but-for test, what's your reaction or what comments do you have with respect to intent? Your Honor, irrespective of this court's decision on materiality, this decision cannot stand based on intent. And this is why. First of all, let's take the GV reference. There is no evidence to the contrary that Mr. Favre did not see the one sentence that talked about solubilizing polysorbate aid and ethanol in docetaxel in reference to… The district court specifically found that he did read that sentence and was aware of it and deliberately withheld the reference. So what's… I mean, why is that finding clearly erroneous? It's clearly erroneous because it's not the reality, Your Honor, and it's not in accord with the facts. The facts are there was a draft of the Gret Boshelin article, which he saw. He testified that he didn't see it. The judge didn't believe him and concluded that he did see it, right? But, Your Honor, well, that gets to a different evidentiary point. Our argument on that is you can't make even a circumstantial evidence finding from nothing. You can't simply say in the face of testimony that he did not see it and, in fact, the article when I showed it to him did not have the sentence in it. And Hospiro's counsel never put that specific sentence in front of him in the published article and say, isn't it a fact that you saw that? It didn't even create a tribal issue of fact. So you can't make an inference from that. Not only that, Your Honor, under Therese's, at least as we understand it, in order to make a finding of intent for inequitable conduct, the circumstantial inference that the court draws has to be the single most reasonable inference. That's what this court said. And so, based on the evidence that the witness didn't see it, that's a reasonable inference and it was uncontradicted by any cross-examination of the trial. What about the Vidal reference? We say there's no intent whatsoever on the Vidal reference because the Vidal reference, Mr. Fobb testified, that each of the experiments they explored with the autoposite formulation failed. And the record is clear that everyone they tested, when they tried to use the autoposite formulation, they couldn't get the stability that they were searching for, which was a minimum of eight hours. District Court found that Mr. Favre admitted it was one of the two main references for selecting polysorbate 80. What was the first one? The Favre reference. It's at the top of page 61 of the District Court's opinion. Your Honor, it was simply not one of the two. He saw the reference initially, but the timeline in all kinder and the Eppley's brief has gotten confusing. Here's the clear timeline. They first came up with their formulation one, Favre and the inventors, which was 50-50, polysorbate 80 and ethanol. And then, in 1989 and 1990, they put it in the laboratory and tested it with beagles. The dogs died. They could not get the minimum effective dose into the beagles before they died. He didn't give that as a reason for not reporting it, did he? Yes, Your Honor, but I didn't direct. He said that when the dogs died and then they returned, while they were working back on formulation one to see if they could get it to work, Mr. Van Graff suggested that they try a formulation similar to a topicite. They tried it and all of them failed. They could not get the stability for a period of eight hours. With the bag, each one of the perfusions that they prepared had a stability in excess of eight hours, right? No. The bag? None of them had a perfusion. The bag? The bag. They couldn't get it to be stable for eight hours. Well, the discipline at 863 says, we're talking about 13 and 14 and then 8, that Mr. Favre did not disclose, remained stable even longer, ranging from five hours and 40 minutes to 32 hours. Isn't that response that the judge had? No. They got a couple of them up to five hours and 42 minutes or thereabouts. And it says up to 32 hours. Is that just an incorrect finding? They did not get them up to 32 hours, Your Honor, until at one point they used massive amounts of polysorbate 8. Oh, no, but they did get it up to eight hours then by using a large amount of polysorbate. Every one of the perfusions that they prepared, which are called the bags, was more than eight hours, right? I don't believe that's true, Your Honor. Let me point you to the section of the record. Your Honor, if you go to joint extract, joint appendix A5565 and 5566, what you'll see there is a table set as toposide-like formulations and it says solution 1 through 18. And you will see, Your Honor, that the highest they got was seven hours with solution 17. That's the highest one. The only one that got over eight hours was formulation 15. That's our invention. That's our precise invention. Look, at 4179, at 451, line 23, the witness says, But in any event, am I right that all three of these perfusion experiments exceeded your eight-hour target? Answer, yes. Where are you reading from, Your Honor? 4179. And it's page 451 and begins on line 23. But in any event, am I right that three of these perfusion experiments exceeded your eight-hour target? He says, yes. Right? But, Your Honor, those were not our invention. That's my point. Those were not our invention. But there's no limit in the claim about the amount of polysorbate, right? Your Honor, those three were our invention. Okay. Okay. So you got a problem. No, we disclosed our invention. That's our point. We disclosed. He gave these experiments as a reason for not disclosing the Bedal reference, but in fact, these experiments that he did showed stability in excess of eight hours, so the reason he gave for not reporting Bedal is shown to be incorrect, right? No, sir. No, sir, because he knew what his invention was. The etoposite formulation didn't work. The etoposite formulation had citric acid, benzyl alcohol, and several other ingredients, which our invention didn't have. His theory, he said, I didn't report the Bedal reference because it wasn't supported by my experiments. And then, on cross-examination, he was shown these confusion experiments. He said, oh yeah, that did show stability in excess of eight hours, right? It's a problem. Your Honor, those experiments were a comparison of our invention with high polysorbate 80 to etoposite with low polysorbate 80. So in order for it to have been an etoposite-like formulation, it had to have low polysorbate 80. None of the experiments on this schedule with low amounts of polysorbate 80, which was etoposite, 8%, could get the relevant stability. And that's a critical part of this because prior to these men's work, no one had been able to determine that you could get that amount of polysorbate 80, which we found was necessary to get eight hours stability. So you couldn't get it with etoposite. So when I asked Bob about it, I said, why didn't you tell Pat about it? He said, they were all failures. One other question on another subject. If, with respect to Claim 5, we were to reject your contention about the claim construction and agree that the district court reached the correct claim construction of perfusion, do you then agree that the claim was obvious over the prior argument? That's correct, Your Honor. And let me be blunt. If this court accepts that all this man did was create an active ingredient in a bag with aqueous solution without any stability. If we reject your position on the claim construction, we affirm as to obviousness. You affirm as long as you don't find that the perfusion in Claim 5 didn't require the minimum amount of stability. If we reject your claim construction, we affirm on obviousness. Correct? If you reject our claim construction and you must buy the district court's claim construction in its entirety, it's always possible that Your Honor... Then we affirm. That's right. But it's always possible in de novo review that you don't agree with Judge Sleet's claim construction and you may not agree with ours in its entirety and you have your own claim construction. But if that claim construction has any aspect of stability and safety or effectiveness, then it's not obvious and the obviousness finding must fall. All right. Thank you. Thank you. You have gone well over, but we'll reserve three minutes for rebuttal. Thank you, Your Honor. All right. Mr. Kirst, I gather you're going to go first? I am. All right. And because we ran over a bit, let's give you 15 minutes. All right. So may it please the court, of the five claims declared invalid for obviousness below, Sanofi is only appealing two of those claims. I want to start with a claim that Mr. Pappas did not address, which is claim seven of the 512 patent, just briefly. This is a puzzling appeal in some ways because even if Sanofi's claim construction is adopted, the invalidity ruling would still be sustained. Well, the other side, if I recall the briefing, I think they did reference in gray that it should be set back if there's a change in claim construction, but I don't recall that they explained why that is. Well, there's two cases, the Smith-Kline case, the Amgen case, which says if you change the claim construction and despite the change in the claim construction there are factual findings that still support an invalidity finding, you still would sustain the ruling below on obviousness. Are we to infer from the fact that you start with claim seven that you're particularly worried about it? No, you should not. I just wanted to address it really quickly and maybe I should just go to claim five instead. Two reasons for that. Claim seven is a composition claim. It covers both perfusions and stock solutions. Sanofi's appeal is strictly limited to perfusions. It doesn't even address stock solutions and the district court found claim seven to be invalid with respect to stock solutions. Well, why don't you move to the perfusion issue, which is the issue we've been talking about. Okay. Claim five of the 561 patent. Obviously it turns on whether or not the district court correctly construed the term perfusion. So no limit on stability? Stability not a factor whatsoever? No limit on stability. So how do you explain the prosecution history relating to the tarmac? The distinction there was made between over 4.5 hours of stability, correct? Yeah, that's true, but it was addressing a different issue. Actually, I think that is a particularly important reference in the appendix and I think it might be worthwhile taking a look at it. It's appendix 5405 and I can read it to you as well. But nowhere in this exchange does Sanofi create a special definition of the word perfusion. Perfusion is simply referring to the physical form of the medication like a tablet or a capsule. There is text here that says, in the sentence that spills over from 5404 to 5405, it says injectable solutions are simply not stable long enough, that's the tar solution, are simply not stable long enough to be useful in making perfusions. And all that refers to is the fact that, yes, an unstable perfusion might not be useful, but it doesn't mean it's not a perfusion. Look at the next sentence, Your Honor. This is the one I wanted to focus you on. These assays are summarized in the following tables, which show results for perfusions, open paren, diluted solutions. That's what a perfusion is. It just refers to the physical form of the medication like a tablet or a capsule. A perfusion is simply a diluted stock solution. But as I understand the tar, let's just back up. Sure. The tar reference has an additional ingredient in it, correct? It does. And is not the point that is being made here in the prosecution history is that we don't have that other ingredient and therefore we don't have a stability problem? That is because the claims at issue at the time were claims that were limited to consisting essentially of. So this argument is all about, the claim was consisting essentially of ethanol and polysorbate. And so the argument that was being addressed is, hey, tar has additional ingredients. And consisting essentially of. What was the additional ingredient in tar that contributed to the lack of stability problem? That was never identified, but the additional ingredients included citric acid, benzoic acid, I believe, just a number of additional ingredients. So the argument was that those additional ingredients impacted the basic and novel properties and therefore tar fell outside the scope of the consisting essentially of claims. And that's why the examiner suggested changing it to consisting of. Yes, that's right. But that suggestion was not adopted and the examiner allowed the claim nonetheless. The consisting essentially of claims, yes. But those claims are not at issue here. My point is this. This exchange does not redefine the term perfusion. In order to create a special definition of the term perfusion, one would have to read this exchange and the spec to say to themselves, we can throw out the ordinary meaning of perfusion, that is a diluted stock solution, and we're going to create a special one that has this eight-hour stability limitation. But let me finish the point I was originally trying to make here with this line at the top. It talks about the fact that this table shows results for perfusions, open paren, diluted solutions. By the way, that's a traditional way to describe what a term means. You open paren, explain what the term means. They're saying perfusion means diluted solution. That is in fact the district court's construction. It's the construction we're adopting. And then go on. Look what they're calling perfusions here. They're calling perfusion solutions that last less than eight hours, as little as two hours and 30 minutes. So Sanofi itself, during the prosecution, used the word perfusion to refer to unstable, according to them, to unstable solutions. Yes, but as Mr. Pappas points out, we've got a regime under Phillips where we read the language of the claims in the context of the spec, and the spec at column two says the new perfusion. It's presumably referring to the term perfusion that's found in claim five, and it says they're stable, blah, blah, blah, seem to appear within approximately eight hours. So isn't that classic definition, well, the classic example of defining what perfusions are in claim five, to have this limitation of eight hours? I don't think so, Your Honor, because what that sentence is referring to, that's referring to what it means to be stable. The eight hours means it will be stable. It is not redefining the word perfusion. That sentence does not change the fact, and this is the order I'm in. Well, it says the new perfusions are stable, so isn't that a characteristic of the perfusion that's required, compelled by this language? I don't think so, Your Honor, because, look, in any specification, you're going to talk about various advantages of the invention. All they're saying is, hey, the advantage of our perfusion invention is that it is stable. If they wanted to incorporate a stability limitation into the claim, they should have done so. This sentence merely says, hey, they're stable, and what we mean by that is that's at least eight hours. That's what they seem to be saying. But they're not redefining the word perfusion by any stretch, and that is confirmed by the prosecution history where they define perfusions as diluted solutions, and they refer to solutions that have stability for as little as two hours and 30 minutes. So the ordinary meaning of perfusion should control. But setting that aside, say you were to adopt this idea that there's an eight-hour, I mean, I'm sorry, that there's some stability limitation inherent in the word perfusion. Even if that were your finding, the ruling below would still be sustained. Why? Because the district court below found that the prior art references taught stability. The finding is that Note 20, Appendix 46, specifically Judge Sleet found, a skilled artisan reading all these references would have a reasonable expectation that the solution would be sufficiently stable to serve its intended purpose. Well, that's kind of thin, though. I mean, there's no reference to the experts. I mean, that's kind of thin, certainly relative to the other findings he made. But it is nevertheless a finding, and it's also a finding supported by the record. Remember, to reverse that finding, you'd have to find clear error, meaning it's not even a plausible finding. But if you actually look at the record, there's a wealth of support for that. For instance, the prior art 470 patent says that dositaxel can be administered within one hour. So to be sufficiently stable to deliver it to a patient, you've got to be stable for at least one hour. And there are a series of references, including, for instance, the tar reference, the atopicide references, where you're using polysorbate-based formulations that last far longer than an hour, as long as four hours and five hours. So there is sufficient evidentiary support for the district court's finding here, and there is no challenge from Sanofi suggesting that that finding is clear error. There's never been an argument that that is clear error. In fact, all they do is they drop in a corresponding footnote saying it's without basis, with no explanation, no effort to address the evidentiary support for that finding. So now moving on to – I want to address the inequitable comments, because there's some questions from – Well, can I ask about inequitable conduct then? The district court initially, when he's talking about what current law is, absolutely correctly, this is a pre-Theresa's opinion, refers to the sliding scale. Is it your view that he never actually employed the sliding scale in his analysis, notwithstanding that in the context of intent, he really did refer to the fact that it was highly material reference? It's true he did reference the law at the time, the sliding scale, but as you read through his analysis, it is not applied. He does not ever say, you know what, I'm going to look for less evidence on intent because these references were so highly material. On the contrary, he did an intent analysis that was quite on the money. He literally found what TheraSense requires, that Mr. Fabry knew about the references, that he considered them to be important to patentability, and intentionally decided not to give them to the patent office. So he made precisely the finding that TheraSense requires. But let me address a couple of questions that were raised earlier, and again, if I may turn you to the appendix, because this answers some of the questions that your honors had about the Vidal reference, and particularly about the experimentation that was done. With Vidal, this was the situation. Mr. Fabry had a problem. The traditional way to formulate insoluble cancer compounds was to use cremaphore, and that caused anaphylactic reactions. He also found a solution. He went to Vidal, and he saw the Sandos experience, where they did, they had an early insoluble cancer compound where they used cremaphore, and they had a later one where they replaced it with polysorbate. And what he testified to, is he said the Vidal reference was, one of my two main references, he said he literally learned to swap cremaphore with polysorbate from Vidal. He admitted that he learned to do that from the Vidal reference. He said it shaped his thinking. He said it gave him a reasonable expectation that he could avoid anaphylactic reactions. This is all straight from the inventor's own testimony. He admitted it was critical to his invention. Now, his explanation for not giving to the patent office is he said he changed his mind. Because he ran a series of experiments internally, and they convinced him that Vidal wasn't important because he couldn't make the atopicite type formulation. That's what Vidal talked about, the atopicite type formulation. That's the prior art. He said, it convinced me that atopicite is not important. Well, look at the experiments themselves. If you go to appendix 5566, there's a table of his atopicite type formulations. On direct, without referring to this document, he has a demonstrative exhibit where he says he made 14 atopicite formulations. He said they all failed in his view because they didn't reach 8 hours. Nothing in the record about 8 hours being important. Contemporaneously, that was solely his bare testimony. On cross, we showed him this document from the production. Look where it continues. The title, atopicite type formulations. This is an admission that these are copying the prior art formulations. Number 15, it goes past 8 hours. It goes to 23 hours. 16, 17, and 18 go close to 5 hours, 7 hours, 5 hours, but it gets worse. If you turn to appendix 5569, this is all information that he surely knew about but did not reveal in direct and perhaps didn't know that this memo was in our possession and was going to be coming at him. Then you go to appendix 5569. They actually created infusion bags. This is literally what the perfusion is going to look like when it's administered to patients. Look at the title at the top. Right below RP56976, atopicite type injectable solution test. He's still copying the art. Why does he call them atopicite? Because in atopicite, there's only one surfactant, polysorbate. When he's using polysorbate as his principal surfactant, he knows he's copying the prior art. Look at the results under bag 1, bag 2, and bag 3 at the bottom. 32 hours, 25 hours, 24 hours. There's no possible justification from these experiments for withholding his main reference, for withholding the reference that taught him to do the swap, which actually taught him to do what he said was his core invention. On cross, he said, my core invention was the idea to swap Premifor for polysorbate 80. He learned that from a critical piece of art that he did not disclose to the patent office. To say that was cumulative of things before the patent office is absolutely incorrect because the teaching that Vidal provided was specifically that you could eliminate anaphylactic reactions by swapping Premifor for polysorbate 80. That was nowhere before the patent office, and that's what he said the key advantage was to his invention. So if there's no further questions from the Court on Inequitable Conduct or any of the obviousness issues, I'd be happy to pass my time. Okay. Thank you very much. Thank you, Your Honor. Mr. Ruzic? Ruzic, yes, sir. Ruzic. Good morning, Your Honors. Richard Ruzic on behalf of Apotex, Inc. Do you have something to add or are you simply going to repeat? I hope I don't repeat. I'm going to add something. I'm going to make it quick and clean. With regards to inequitable conduct, this court can affirm inequitable conduct under Therosense without even reaching claim construction or invalidity. Recall that the district court held that both the perfusion-type claims as well as the stock solution claims were invalid as unenforceable. However, Sanofi only appeals, and their entire evidence is directed towards only the perfusion-type claims, not the stock solution claims. As my counsel pointed out, most of these claims cover both stock and perfusion. For instance, Claim 7 does. Claim 1 does, from which that depends. Specifically, so in short, they appeal only half of the district court's findings when it comes to inequitable conduct, and that's a problem for them. Specifically, the district court's claim construction and its 103 analysis are sufficient to affirm that the withheld references, the GB and the Vidal references, are but-for material under Therosense. And recall that Therosense has a lower standard when it comes to but-for materiality, the preponderance of the evidence standard. So I believe Judge Proce, you mentioned in the beginning, should we rule for the but-for materiality in favor of Apotex and Aspera, then isn't the but-for materiality a moot issue? It most certainly is. As to the, and just to be specific here, the withheld references invalidated Claims 2 and 10 of the 561, and they also invalidated Claim 33 of the 512. They don't appeal that. That's a problem. With regards to intent, all the testimony on the record, and even on appeal, if you look at the reply brief, the reply brief doesn't even address that particular issue, is all directed to perfusions. Perfusions weren't stable. They weren't effective. They weren't safe. They weren't stable up to eight hours. So what? The G.V. and Vidal references undisputedly disclose stock solutions. They don't appeal that particular finding. So with that said, Your Honors, I think that the Court here can readily affirm what happened down below, and if there are any other questions, Apotex has nothing further. Thank you very much. I'd like to return briefly, Your Honors, to the issue of perfusion. If I heard correctly, Mr. Hurst did indicate that stability is indeed part of a perfusion. Now... No, I don't think he said that. Well, let me say this then. I thought I heard that he did, but it has to be stable for some period of time. I think on that we can agree, and I'll tell you why. Because from the very language of Claim 5, there's no way a perfusion could be capable of being injected into a woman with breast cancer to avoid anaphylaxis and alcohol intoxication if it doesn't have some minimal period of stability. For example, if the drug, docetaxel, after being put into an aqueous solution or glucose, in the bag, even before it gets hooked up to the woman, precipitates out in 30 seconds, then it's not capable of being injected to avoid anaphylaxis. If it precipitates one minute after it's in the woman's veins, before it gets to the breast, where the cancer is, and thereby causes a clot and kills her, which is what would happen if the docetaxel isn't stable, then Claim 5 could never be satisfied. In other words... What about the testimony he's relying on, that the prior art had some degree of stability, whether or not it showed heat hours, it showed some degree of stability. The prior art showed some degree of stability, but not with polysorbate 80. There was only one drug, one drug, that used polysorbate 80. Cremafor was the choice. As late as 1990... Didn't those experiments show that polysorbate 80 had some stability? Two hours. Two hours with 8%. That's not enough. But what that doesn't... That was etoposide, Your Honor. That's a different active ingredient. This is very critical, by the way, for the court to understand. They're talking about something that was etoposide, a different active ingredient that had nowhere near the serious problems with solubility that a taxane did. This was docetaxel, and paclitaxel, the other one that's in taxa. They are the hardest molecule to get into solution and keep in solution. And therefore, we ended up... Our inventors ended up finding that they had to use five times as much polysorbate 80 to get docetaxel in solution, have it remain in solution. So this was a very difficult problem, and it had never been solved, notwithstanding 15 years of people trying to find a substitute for Cremafor that in the original clinical trials killed women. No one could find polysorbate 80 used with docetaxel for a sufficiently long enough period of time to treat the woman. Now let me just finish on this point. Your honors do have the reference in the file history, which I believe is very helpful. I want to turn this debate slightly around because the claim construction should remain the same whether the patentee wants a broad one or has perfusion and admits, as we do, that it's defined by the stability. If I was standing before your honors arguing that the competition's perfusion with 4.5 hours of stability infringed our patent, which under Judge Sleet's construction it would infringe because he has no stability issue. This court would be looking at me and saying, Mr. Pappas, you all gave that up in prosecution history when you told the examiner that 4.5 hours, such as in Tarr, was not stable enough to make a perfusion. You distinguished over Tarr and therefore, as a patentee, you are stopped from attempting to enforce this claim, 5, against a 4.5 hour perfusion. If I tried to reach a 2 hour perfusion you would say we were prosecuted. Prosecution history has stopped from doing so. Now if that's true, and that's what a patentee faces, when they give it up, then it seems to me in light of your decisions in many of these cases in the past, it should have perfusion. Such as ICU Med where the word spike wasn't construed to not encompass non-pointed structures because the specification suggests spike can't be anything but pointed. As recently as IONET, this court held that hard copy had to be based on the written description regardless of the plain meaning. And recently in MARTEC, this court actually sanctioned lawyers 6 days ago because they argued that bondage in the claim did not account for the limiting definition provided by the specification. I stand before you and say that when we say 8 hour stability to a perfusion, it is, means, only a special kind of perfusion. But we live by that. I think we have your point, Mr. Pappas. Thank you very much. Case is submitted.